IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DAROUSH EBRAHIMI, | |
| **Plaintiff,** | |
| v. | Case No. 18-cv-1350-NJR |
| ROB JEFFREYS, ANTHONY WILLS, MOHAMMED SIDDIQUI, ANGELA CRAIN, and WEXFORD HEALTH SOURCES, INC.,[1] | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

Plaintiff Daroush Ebrahimi, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Menard Correctional Center ("Menard"), brings this case for violation of his constitutional rights pursuant to 42 U.S.C. § 1983, as well as claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 794–94e.

This matter is before the Court on summary judgment motions filed by Defendants Mohammed Siddiqui and Wexford Health Sources, Inc. ("Wexford") (Docs. 146, 147) and Rob Jeffreys, Anthony Wills, and Angela Crain (Docs. 149, 150, 153). Ebrahimi filed a summary judgment motion (Docs. 151, 152), as well as a response to Defendants' motions

---

[1] John Baldwin was sued in his official capacity for claims under the Americans with Disabilities Act and the Rehabilitation Act. As Rob Jeffreys is the current director of the Illinois Department of Corrections, he is the proper defendant for purposes of these claims. Rob Jeffreys is SUBSTITUTED in place of John Baldwin. Jacqueline Lashbrook is also in the case in her official capacity, solely for the purpose of implementing any injunctive relief awarded. Anthony Wills is the current warden and thus is SUBSTITUTED for Lashbrook, in his official capacity only.

(Doc. 159). Dr. Siddiqui and Wexford filed a response to Ebrahimi's motion (Docs. 156, 157, 158) and a reply brief (Doc. 161).

BACKGROUND

On July 2, 2018, Ebrahimi filed his Complaint (Doc. 1) alleging violations of his constitutional rights and violation of the ADA and RA. He was allowed to proceed on the following counts:

| Count 1: | Eighth Amendment deliberate indifference claim against Dr. Siddiqui and Crain for refusing to provide Ebrahimi with a cane or other assistive walking device. |
|---|---|
| Count 2: | ADA and RA claim for failing to provide Ebrahimi with a cane or other assistive walking device, or to otherwise provide him with access to the prison's cafeteria, exercise/recreational areas, and other areas accessible to non-impaired prisoners. |
| Count 3: | Eighth Amendment deliberate indifference claim against Dr. Siddiqui for discontinuing medication that relieved Ebrahimi's chest pain, failing to provide him with effective treatment for his pain, delaying his referral to a cardiovascular specialist, and failure to provide him with medications recommended by the specialist. |
| Count 4: | Eighth Amendment deliberate indifference claim against Wexford for failing to approve Ebrahimi's referral to a cardiovascular specialist and failing to approve his prescription medications recommended by the specialist. |

(Doc. 7, pp. 5-6).[2]

---

[2] The Court originally assigned counsel to Ebrahimi to draft a First Amended Complaint (Doc. 68) which assigned counsel later asked to dismiss (Doc. 75). Ebrahimi objected to the dismissal and asked for his counsel to be withdrawn (Docs. 78, 79, 81, 93). Ebrahimi later asked to withdraw the First Amended Complaint and proceed on his original claims as set forth in the Complaint and the Court's threshold order (Docs. 105 and 110). Thus, the original Complaint is the operative pleading.

### A. Medical Care for Heart Condition

Before arriving at Menard, Ebrahimi was diagnosed with coronary artery disease and provided with medication (Doc. 152-1, pp. 38, 42-46, 49-52, 54-56, 58-60). During his intake at IDOC on January 15, 2013, Ebrahimi's medical chart noted that he suffered from coronary artery disease, high cholesterol, and high blood pressure (*Id*. at p. 79). Upon transferring to Menard on February 20, 2013, it was noted that Ebrahimi also utilized a crutch (Doc. 147-3, p. 1). He was enrolled in the chronic care clinic (Doc. 152-1, p. 89).

On July 15, 2013, a nurse noted that Ebrahimi refused his medications, including aspirin, Plavix, Lopressor, and Vasotec, and his medications were discontinued (Doc. 147-3, pp. 7, 13). On July 27, 2013, it was noted that Ebrahimi did not understand the refusal form he was signing due to his language skills and asked for the medication to be restarted (*Id*. at pp. 8, 10). On August 2, 2013, a physician noted that Ebrahimi wanted his blood pressure medications restarted and complained of dizziness (*Id*. at p. 9). His blood pressure was 140/80. According to the physician, there was no indication of a need for blood pressure medication; Ebrahimi was directed to follow-up as needed (*Id*. at p. 10).

In March 2014, Ebrahimi complained of tightness in his chest and a 30-year problem with chest pain (Doc. 152-1, p. 93). Although he wanted his Plavix renewed, it was not renewed (*Id*. at p. 95). Through 2014, he continued to complain of heart disease and ask for renewal of his Plavix (visits on June 17, 2014, June 20, 2014, Aug. 23, 2014, September 2, 2014; *Id*. at pp. 97, 99, 101, 103). On September 2, 2014, in response to his complaints of dizziness, four weekly blood pressure checks were ordered, as well as an EKG (Doc. 147-3, p. 17). Ebrahimi's weekly blood pressures from September 2 until October 3, 2014, were: 120/80, 130/82, and 140/90 (*Id*. at p. 18). On October 3, 2014, the checks were discontinued (*Id*.). On

November 28, 2014, he was seen in the hypertension chronic clinic (*Id*. at p. 31). His blood pressures were 152/78 (*Id*. at p. 30). He was again prescribed weekly blood pressure and pulse checks, an EKG, a chest x-ray, and Nitroglycerin (*Id*. at p. 31). A subsequent chest x-ray showed that his heart and vasculature were within normal limits with no active sign of pulmonary disease (*Id*. at p. 42). He was seen in the hypertension clinic on March 13 and September 18, 2015, and his pressures were stable (*Id*. at pp. 32-34).

On December 24, 2015, Ebrahimi first saw Dr. Siddiqui for constipation and Gastroesophageal Reflux Disease ("GERD"), which was relieved by Zantac (*Id*. at p. 21). Throughout 2016, he was seen in the hypertension clinic; his pressures were good and his condition stable (*Id*. at pp. 22-23, 36-41). On March 16, 2017, he reported chest pain and was referred to the physician (*Id*. at p. 43-44). His blood pressure was 128/76 (*Id*.). The next day, he was seen by a non-party nurse practitioner who noted that an EKG showed premature ventricular contractions ("PVC") (*Id*. at pp. 45-47). In the hypertension clinic on March 23, 2017, his blood pressure was 170/98, and he was labeled with a fair and deteriorating condition (*Id*. at pp. 122-123). He was referred for a cardiology appointment (*Id*. at pp. 123, 80).

On April 5, 2017, the request for a cardiology consult was presented to collegial review (*Id*. at p. 50). The review was conducted by Dr. Ritz, who proposed an alternative plan of an EKG, chest x-ray, and a review of previous cardiology records (*Id*. at p. 50, 81-82). Dr. Siddiqui signed the referral denial, which informed Ebrahimi of Dr. Ritz's decision (*Id*. at pp. 81-82). On April 8, 2017, a non-party nurse practitioner noted Ebrahimi's blood pressure as fairly stable, in the 140-150s, and ordered an EKG (*Id*. at p. 51). On April 13, 2017, the EKG was completed (*Id*. at pp. 51, 129). On May 1, 2017, after the alternative plan was completed, Dr.

Ritz again reviewed the collegial review, and Ebrahimi was approved for a cardiology appointment (*Id*. at pp. 53, 83).

On June 7, 2017, Ebrahimi saw cardiologist Dr. Craig Vinch for chest pain, heart problems, and coronary artery disease ("CAD") (Doc. 147-3, pp. 86-87, 91-92, 95-99). His blood pressure at the time was 126/70 (*Id*. at p. 86). Dr. Vinch recommended that Ebrahimi go back on Plavix and have an exercise myoview stress test (*Id*. at p. 87). An EKG performed on that day was normal (*Id*. at p. 132). When Ebrahimi returned from the appointment, Dr. Siddiqui ordered Plavix, and paperwork was given to schedule the requested tests (*Id*. at pp. 55, 126). The requested stress test was approved by Collegial Review (*Id*. at pp. 60, 62, 84, 88, 90, 94). Notes from the medical furlough clerk indicate that the cardiologist wanted to see the stress test results before a follow-up appointment (*Id*. at p. 59). Dr. Ritz also noted that he wanted to review the stress test results before approving a follow-up referral (*Id*. at p. 89). Dr. Siddiqui continued the Plavix prescription for one year (*Id*. at p. 127). After the July 2017 stress test results were labeled as positive, Dr. Siddiqui placed a request for a coronary angiography as requested by the cardiologist (*Id*. at pp. 101-102, 106). On July 27, 2017, the request was approved (*Id*. at pp. 65, 103). Collegial ordered that the procedure be performed by an interventionalist in case Ebrahimi needed stents (*Id*. at p. 103).

On August 18, 2017, Ebrahimi had a coronary angiogram and two stents were placed (Doc. 147-3, pp. 107-112, 178-184). On August 21, 2017, Dr. Siddiqui referred Ebrahimi for a cardiology follow-up with Dr. Vinch; the request was approved (*Id*. at pp. 70, 113-14). Dr. Vinch recommended that Ebrahimi continue on his medications and follow-up in eight months (*Id*. at pp. 116-118).

On October 30, 2017, Ebrahimi was seen in the hypertension clinic, and his condition

was noted as controlled and stable; his blood pressure was 100/70 (*Id*. at pp. 124-25). On the same date, he also underwent a two-year physical where Dr. Siddiqui noted that he recently had a coronary stent placed and suffered from CAD, hypertension, osteoarthritis, and back pain (*Id*. at pp. 137-39).

During 2016 and 2017, Ebrahimi also wrote grievances about his medical issues. Although his May 18, 2016 grievance complained of his need for a cane and pain medications, attached records also included a handwritten request for medication for chest pain (Doc. 152-1, pp. 176-180). The grievance was denied, indicating that he had a number of permits and there were no recent sick calls for back pain (*Id*. at p. 182). Subsequent grievances in 2016 and 2017 complained about the need for an appointment with a heart specialist and chest pain medication (*Id*. at pp. 185, 189, 191). The grievances were denied because he was seen in the cardiac clinic. He was advised to address his requests and complaints of pain with medical staff (*Id*. at pp. 184-193).

Although Ebrahimi's later hypertension clinic visits and EKG in March and April 2018 showed that his condition was stable, he complained of intermittent chest pain on March 30, 2018, and again on April 6, 2018 (Doc. 147-1, pp. 134, 142-143, 210-11). On April 6, 2018, Dr. Siddiqui referred Ebrahimi for a follow-up cardiology appointment (*Id*. at p. 120). On May 18, 2018, an EKG showed a sinus rhythm with blocked premature atrial complexes (extra heartbeats) and low voltage QRs (EKG wave heights low) (*Id*. at p. 133). Dr. Regina Chiu, a cardiologist, saw Ebrahimi and recommended a repeat stress test, Imdur for chest pains, aspirin, and Plavix, a high intensity statin, exercise, and a cane (*Id*. at pp. 186-88, 283-84). Upon his return to Menard, Dr. Siddiqui ordered the Imdur and an increase in his Zocor (*Id*. at pp. 148-49). On May 25, 2018, Dr. Siddiqui saw Ebrahimi and ordered that he start Imdur

and have a repeat stress test (*Id*. at p. 151).

### B.  Access to Cane

Ebrahimi has problems with lower back pain and his heart which he believes makes him disabled (Doc. 150-1, pp. 45, 61). He suffers from a burning in his chest (*Id*. at p. 60). He also has multiple stents in his heart (Doc. 159-1, pp. 48-51). He is able to move his arms and legs and tries to walk outside for fresh air (Doc. 150-1, pp. 55-56). He also suffers from hearing loss (*Id*. at pp. 65-67). Ebrahimi currently has a low gallery and low bunk permit and uses a cane (*Id*. at pp. 68-69). He also wants a wheelchair but is not currently prescribed one (*Id*.).

Ebrahimi originally arrived at Menard with a crutch, but at some point the crutch was taken from him (Doc. 159-1, pp. 81, 83; Doc. 150-1, p. 69; Doc. 147-3, p. 3). On March 22, 2013, he was evaluated by a non-party physician who noted that Ebrahimi ambulated well; he was given a low bunk and low gallery permit for one year (Doc. 147-3, p. 4). In May 2018, Ebrahimi saw cardiologist Dr. Regina Chiu for his chest pain (Doc. 41-1). In addition to the testing and medication, she ordered that he have 30 minutes of exercise a day (*Id*.). Due to his stated difficulties in walking, she asked if he could have a cane for support (*Id*.). Dr. Chiu testified she added the portion about his difficulties walking at Ebrahimi's request (Doc. 150-6, p. 32). She did not recall seeing Ebrahimi walk, nor did she assess his gait (*Id*. at pp. 47-48). She did not recommend the cane; it was his request as he was very insistent about wanting a cane (*Id*. at p. 57). Dr. Chiu testified that Ebrahimi could be very insistent and, rather than cause issues with him, she simply wrote his request (*Id*. at pp. 57-58). She testified it was easier to put in his request so she could move on to other issues (*Id*.).

Angela Crain was the assistant or backup ADA coordinator from 2013 through 2016 and was the ADA coordinator from September 2017 through December 2019. (Doc. 153, p. 18)

She was also the Nursing Supervisor from January 2012 to August 2018, Director of Nurses from August 2018 to October 2019. She has been the Health Care Unit Administrator since October 2019 (*Id*. at pp. 21-22). As ADA Coordinator, she ensured that inmates received reasonable accommodations that were recommended by a medical doctor (Doc. 20-1).

On July 10, 2018, Crain received a kite from Ebrahimi dated June 30, 2018, requesting a cane and exercise accommodations (Doc. 20-1, p. 2). She referred him to Dr. Siddiqui for evaluation. On July 11, 2018, he was seen by a nurse and also requested a cane. It was noted he had an unsteady gait on stairs, and he was referred to the doctor for an evaluation for a cane (Doc. 20-2, p. 49). He was originally scheduled for a doctor visit regarding his cane request on July 17, 2018, but he refused the appointment and went to yard (*Id*. at p. 56). On July 24, 2018, Dr. Siddiqui examined Ebrahimi, and he was referred to physical therapy for an evaluation (Doc. 20-1, p. 2; 20-2, p. 56). On August 7, 2018, Dr. Siddiqui provided Ebrahimi with a wheelchair until he could be evaluated (*Id*.; Doc. 20-2, p. 59). His permits were also renewed at that time, including permits for: low bunk, low gallery, medical lay-in, shower on gallery, feed in cell, shower chair, and wheelchair (Doc. 20-2, p. 59; Doc. 150-3, p. 121).

On August 30, 2018, Ebrahimi saw Dr. Siddiqui and requested a four-pronged cane. He was again referred to physical therapy for an evaluation (Doc. 150-3, p. 9). On September 11, 2018, Crain made a note in Ebrahimi's medical file about his request for a cane (*Id*. at p. 13). She noted that he was scheduled to be evaluated by physical therapy; she requested that he be examined by September 13, 2018 (*Id*.). On September 13, 2018, Crain noted in Ebrahimi's medical file that she spoke with the physical therapist. She noted she was uncertain of his endurance level and asked the therapist to notify her after Ebrahimi reported to the healthcare unit about his evaluation (*Id*. at p. 14). After the assessment, the physical

therapist recommended a straight cane for out-of-cell activity (*Id*. at pp. 15-16). Crain contacted the official responsible for ordering devices to order Ebrahimi a cane (*Id*. at p. 15). On October 16, 2018, Ebrahimi received a cane (*Id*. at p. 122).

As ADA coordinator, Crain testified that she could not make a determination as to Ebrahimi's needs herself, but she referred him to Dr. Siddiqui to determine his need for a cane (Doc. 153, pp. 139, 143). She also could not influence the physical therapist's evaluation (*Id*. at p. 143). Wexford was in charge of ordering assistive devices (*Id*. at pp. 150-51).

## LEGAL STANDARDS

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing Fed. R. Civ. P. 56(a)). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

**B.  Deliberate Indifference**

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either

intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). The standard is a high hurdle, requiring a "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).

### C. ADA and RA

In order to make out a *prima facie* case of discrimination under both the ADA and the RA, a plaintiff must show: (1) that he suffers from a disability as defined in the statutes, (2) that he is qualified to participate in the program in question, and (3) that he was either excluded from participating in or denied the benefit of that program based on his disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). The RA further requires that a plaintiff show that the program in which he was involved received federal financial assistance. *Id.* at 810 n.2; *see also* 29 U.S.C. § 794(a). *Novak v. Bd. of Trustees of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015).

ANALYSIS

### A. Dr. Siddiqui

#### 1. *Access to Cane*

Simply put, Dr. Siddiqui is entitled to summary judgment on Ebrahimi's claims regarding his need for a cane. Ebrahimi points to several requests he made for a cane and complaints to nurses about his need for a cane. These visits occurred in 2013, and Ebrahimi acknowledges that Dr. Siddiqui did not start at Menard until 2015. Ebrahimi's sole argument in response to Dr. Siddiqui's motion for summary judgment is that Dr. Siddiqui did nothing to address his requests and grievances regarding the need for a cane after Dr. Siddiqui arrived at Menard in 2015, but he fails to point to any evidence in the record to suggest that

Dr. Siddiqui had notice of Ebrahimi's complaints after his arrival. There is no evidence in the record to suggest that Dr. Siddiqui was aware of Ebrahimi's need for a cane until Dr. Chiu placed the request in her orders on May 18, 2018 (Doc. 41-1).

In her May 2018 order, Dr. Chui wrote that Ebrahimi needed 30-minutes of exercise and asked if he could have a cane. She testified that she placed the request for a cane in the notes at Ebrahimi's direction and that she did not personally evaluate his need for a cane (Doc. 150-6, pp. 57-58). Based on that note, Dr. Siddiqui referred Ebrahimi for an evaluation by the physical therapist. There is no evidence from which a jury could find the referral amounted to deliberate indifference because Dr. Chiu did not order or even recommend a cane. She simply posed a question at the insistence of Ebrahimi. Further, Dr. Siddiqui referred Ebrahimi for the evaluation and provided him with numerous permits, as well as a wheelchair until his evaluation was completed. (Doc. 20-1, p. 2.; 20-2, pp. 56, 59; Doc. 150-3, p. 121). Because there is no evidence that Dr. Siddiqui delayed Ebrahimi's referral for an evaluation or that he denied Ebrahimi a cane, Dr. Siddiqui is entitled to summary judgment on Count 1.

### 2. *Heart Condition*

First, the Court notes that Ebrahimi does not dispute that Dr. Siddiqui properly treated his back pain with pain medication and discontinued the pain medication after he found him hoarding it (Doc. 147-3, pp. 249-251). Although the Court's threshold order indicated that Ebrahimi's claim included treatment regarding pain, Ebrahimi does not dispute that he was provided treatment for his back and other associated pain, and a review of the medical records makes clear that he was treated for back pain (Doc. 159, p. 4). Further, Ebrahimi testified that he had access to pain medications (Doc. 147-1, p. 63). Thus,

Dr. Siddiqui is entitled to summary judgment on any claim related to Ebrahimi's pain management.

The parties also do not dispute that Dr. Siddiqui did not participate in Ebrahimi's care prior to December 24, 2015, nor did he participate in the initial termination of his Plavix in 2013. Thus, to the extent that Ebrahimi alleges that Dr. Siddiqui was deliberately indifferent in denying him medication after it was initially discontinued (Doc. 159, pp. 3-6), Dr. Siddiqui is entitled to summary judgment. There is simply no evidence that he participated in any earlier treatment of Ebrahimi or in initially discontinuing his Plavix.

The parties also do not dispute that Ebrahimi suffered from a serious medical need, in that he suffered from CAD. Instead, Dr. Siddiqui argues that he was not deliberately indifferent to Ebrahimi's condition, nor did he delay treatment.

Dr. Siddiqui first saw Ebrahimi on December 24, 2015. Ebrahimi argues that Dr. Siddiqui improperly diagnosed him as having GERD. He argues that if Dr. Siddiqui had performed a review of his medical records, he would have seen an October 2015 entry where Ebrahimi asked to be placed back on Plavix (Doc. 159-1, p. 38). If he had reviewed the medical records, Ebrahimi argues that Dr. Siddiqui would have or should have identified the burning in his chest as consistent with his history of heart disease. But as Dr. Siddiqui points out, the notes from the December 24, 2015, appointment do not indicate that Ebrahimi complained of burning in his chest or pain. Instead, he complained of "GERD," and he felt relief with Zantac (Doc. 147-3, p. 21). Nothing in the record indicates that Dr. Siddiqui was aware of Ebrahimi's concerns of chest pain or CAD. There is also no indication in the records that his blood pressure was high, and his blood pressures at previous hypertension clinics were stable (*Id*. at pp. 32-34). Although Ebrahimi argues that Dr. Siddiqui's failure to properly review

medical notes and history on this first visit amount to deliberate indifference, at most the failure amounted to negligence. And evidence of medical negligence is not enough to prove deliberate indifference. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016); *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016). A mistake in professional judgment cannot be deliberate indifference "because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). There is simply no evidence that Ebrahimi told Dr. Siddiqui about chest pains not associated with GERD or that Dr. Siddiqui was aware of Ebrahimi's cardiac history at that time.

Ebrahimi also points to a year and a half gap between when Dr. Siddiqui first encountered Ebrahimi and the referral to a cardiologist. But there is no evidence in the record to suggest that Dr. Siddiqui saw Ebrahimi after the December 2015 appointment or that he was aware of subsequent grievances written by Ebrahimi. Nothing in the grievances indicates that they were reviewed by Dr. Siddiqui, and Angela Crain testified that nursing supervisors drafted the grievance responses (Doc. 153, pp. 45-46). [3] Further, he was seen in the hypertension clinic, and his blood pressure was noted as stable (Doc. 147-3, pp. 22-23, 36-41). He was regularly monitored and was stable during that time period. The first time that his condition was noted as anything other than stable was in March 2017, when the hypertension

---

[3] Ebrahimi points to deposition testimony that the Healthcare Unit Administrator would take the grievance to the site medical director and cites to excerpts of a deposition from Wexford representative Glen Babich (Doc. 152-1, pp. 68-76). The exhibit is not numbered with the deposition page numbers— and the quote Ebrahimi identifies is not found in the excerpts. Instead, the transcript states that the healthcare administrator is not going to supersede a physician, but if she finds a need for an appeal or other concern she "can go back to the agency medical director, who is a physician within the Department of Corrections." (Doc. 152-1, p. 72). She could also take any issues to the site medical director (*Id.* at p. 73). There is no indication in the grievances attached that Dr. Siddiqui reviewed the grievance or that Crain consulted with him.

clinic noted his condition was of "fair" control and deteriorating (Doc. 147-3, pp. 122-23). That same day, a request for a cardiologist referral was sent to Collegial Review (*Id*. at pp. 80, 123). There is no evidence that Dr. Siddiqui was aware of Ebrahimi's need for Plavix or any other specialty care prior to when his condition was labeled as not controlled in March 2017.

Finally, to the extent that Ebrahimi alleges Dr. Siddiqui was deliberately indifferent in delaying his referral to a cardiologist after the initial request in March 2017, the delay was short. Ebrahimi was initially referred for a cardiology evaluation on March 23, 2017. That request was denied until an EKG, chest x-ray, and prior medical records were obtained (Doc. 147-3, p. 81). Although Dr. Siddiqui signed the denial form, he notes that the decision was made by Dr. Ritz (*Id*. at p. 82). Further, an appeal was submitted on April 25, 2017, which Dr. Ritz approved (*Id*. at p. 83). The approval was documented on May 1, 2017, and Ebrahimi was then scheduled for a cardiologist referral (*Id*. at p. 53). The delay from the initial referral until its ultimate approval was short.

Further, there is no evidence that this delay caused Ebrahimi harm. "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (internal citations omitted). Here, Ebrahimi fails to offer such evidence. Although Ebrahimi argues that when he saw the cardiologist he had two blockages that presented as chest pain, he fails to point to any evidence in the record that those two blockages developed or worsened during the short delay. He also argues that he suffered additional pain during the time he waited to see a

cardiologist, but he acknowledged that he was provided Nitroglycerin for the pain (*Id.* at p. 31-32, 39). Further, interventionalist cardiologist Dr. Shah testified that there were no medications that could prevent future blockages; "the coronary would have progressed regardless" (Doc. 147-5, pp. 29-30). There is no evidence from which a jury could find that Ebrahimi's condition worsened during this time-period or that Dr. Siddiqui caused any of the delays. Accordingly, Dr. Siddiqui is entitled to summary judgment.

### B. Wexford Health Sources, Inc.

As to Wexford, Ebrahimi argues that Wexford had improper policies and practices, but he never identifies the specific policy or practice at issue. In response to Wexford's motion for summary judgment, Ebrahimi argues that Wexford's "documented medical guidelines resulted in Wexford medical providers disregarding the signs of…Ebrahimi's coronary artery disease progressing," but he fails to identify those guidelines (Doc. 159, p. 9). He also argues that Wexford is liable "through its prior providers carrying out Wexford's inadequate and improper policies and practices" (*Id.*). But again, Ebrahimi fails to further identify the policies and practices that were inadequate.

Instead, Ebrahimi argues that regular follow-up with a cardiologist on at least an annual basis is recommended for those with heart issues, but that inmates treated by Wexford staff might never see a cardiologist. Ebrahimi also argues that inmates at Menard rarely receive the appropriate standard of care of annual visits to a cardiologist. But the evidence presented does not establish a practice of not referring inmates to the cardiologist.

In support of his position that inmates at Menard rarely see cardiologists, he relies on the testimony of Dr. Siddiqui. But Dr. Siddiqui testified that it depended on the situation, and if an inmate was doing well "and have no complaints, no symptoms, they may not see

cardiologist at that point." (Doc. 147-2, p. 51). [4] Further, the Wexford guidelines give deference to the providers for referrals to cardiologists for "any patient at your discretion," and for NYHA Class II, III, & IV patients (Doc. 152-1, p. 247). [5] The guidelines also provide for follow-up timelines (Doc. 152-1, p. 250). Similarly, IDOC administrative directives provide for hypertension or cardiovascular clinics every six months "if determined to be in good to fair control by the provider." (Doc. 151-1, p. 230). And Ebrahimi was regularly seen in the hypertension clinic and monitored until his condition was no longer stable (Doc. 147-3, pp. 22-29, 32-43, 122-25, 210-13, 267-70). Further, Ebrahimi was referred for several follow-up visits with the cardiologist for his condition (*Id.* at pp. 70, 113-14, 120-21, 145-47, 165, 189-90). Nothing in the referenced exhibits demonstrates a policy or practice of not referring inmates to a cardiologist.

There is also no evidence to suggest that an individual with Ebrahimi's condition must be seen on an annual basis, or that the lack of a policy to have regular follow-up with a cardiologist amounts to deliberate indifference. Although the failure to make a policy can be actionable, there is simply no evidence that Wexford had a policy or practice of not referring inmates or continuing with follow-up visits. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) ("Inaction, too, can give rise to liability in some instances if it reflects a conscious decision not to take action.") (quotations omitted). It is a high bar, and a plaintiff must show the policy was the moving force behind the constitutional violation. *Dean*, 18 F.4th at 235.

---

[4] Ebrahimi's attached exhibits are without page numbers and make it difficult to locate the quote he references (Doc. 152-1, p. 84).
[5] Ebrahimi's attached exhibit is not labeled with the page numbers referenced in his brief, making it difficult to identify the appropriate pages.

To support his claim that Wexford delayed his care by not referring him for annual cardiologist follow-up visits, Ebrahimi offers the testimony of cardiologist Dr. Shah, who treated Ebrahimi in August 2017. When asked about his current care of inmates, he testified that the number of inmates currently under his care was "less than 10" and that his care involving inmates usually dealt with "unstable symptoms or with a myocardial infraction. Our care is limited to taking care of the acute problem." (Doc. 147-5, p. 10). He also did not recall having a prisoner "currently" follow with him on a regular basis or a six-month basis (*Id.*). But this single statement does not indicate that other inmates were improperly denied referrals or follow-up visits to cardiologists. This evidence is far from identifying other constitutional violations by Wexford. In order to demonstrate such a policy existed, Ebrahimi must offer "more proof than the single incident…to establish both the requisite fault…and the casual connection between the policy and the constitutional violation." *Dean*, 18 F.4th at 236 (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808. 824 (1985)). He fails to do so. All he offers is his care and a statement from Dr. Shah. But Dr. Shah also testified that if inmates needed "to come back, which is not often, then [he] will make an appointment to see them back in the office. It usually depends on the patient, on what his condition is." (Doc. 147-5, p. 11). There is simply no evidence of a widespread practice of refusing to refer inmates to a cardiologist. *Dean*, 18 F.4th at 237 (plaintiff failed to offer any evidence that collegial review had caused unconstitutional delays in other inmates' treatments). Thus, Wexford is also entitled to summary judgment.

## C.  Angela Crain

Further, there is no evidence from which a jury could find that Crain acted with deliberate indifference in obtaining an assistive device for Ebrahimi. Ebrahimi argues that he

complained about his need for a cane shortly after his arrival in 2013. He points to several entries in the medical records from 2013 where he complained about his need for a cane and the fact that his previous cane was taken away from him (*See* Doc. 159-1, p. 81, 83, 85, 87). But there is no indication in the records that Crain was aware of these previous complaints or visits, nor did she have personal knowledge, at the time, of his need for a cane. In order to be liable under Section 1983, an official must be personally involved in the deprivation. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). At the time of his complaints, Crain was the assistant or backup ADA coordinator and nursing supervisor, but there is nothing in the record showing that she was aware of his complaints during nursing visits. Nor can she be liable as a nursing supervisor because an official is not liable for the knowledge and actions of those she supervises. *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011). There is simply no evidence in the record from which a jury could find that Crain had personal knowledge of Ebrahimi's need for a cane in 2013.

Ebrahimi also points to a grievance he submitted on December 8, 2014, which Crain reviewed as the nursing supervisor (Doc. 159-1, p. 89). In that grievance, Ebrahimi indicated that he could barely walk, was unable to take 30 consecutive steps, and could not stand long enough to brush his teeth (*Id.*). He did not indicate in the grievance that he was missing a cane or that he needed a cane. Although Ebrahimi indicates that Crain responded to the grievance as nursing supervisor, he does not attach her response—nor does he indicate that she failed to respond. And it appears that she did respond to the grievance (*Id.*). Even if she denied the grievance, the simple denial of a grievance does not amount to a constitutional violation. *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of [a prisoner's] grievance by persons who otherwise did not cause or participate in the underlying

conduct states no claim."); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) (denying a grievance does not cause or contribute to a constitutional violation). Nor was she required to investigate further than any medical reports from staff. *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019). Ebrahimi fails to offer any evidence to suggest that she responded inappropriately or with deliberate indifference in responding to the grievance. As a prison official who did not provide medical care for inmates, Crain was allowed to rely on the judgment of the medical professionals who evaluated Ebrahimi for his earlier need for a cane. *See Giles*, 914 F.3d at 1049 ("If a prisoner is under the care of medical experts…a non-medical official will generally be justified in believing that the prisoner is in capable hands.") (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)).

Once Ebrahimi finally obtained a request for a cane from Dr. Chiu in May 2018, there is no evidence in the record to suggest that Crain acted with deliberate indifference in getting Ebrahimi a cane. First, the Court notes that Dr. Chiu testified that she did not evaluate Ebrahimi's need for a cane and only wrote the request at his direction in order to placate him (Doc. 150-6, pp. 57-58). Thus, the Court finds no deliberate indifference in the decision to refer him to physical therapy for an evaluation. Further, the evidence in the record suggests that Crain facilitated—not hindered—that evaluation. When she received a kite from Ebrahimi about his request for a cane, she referred him to Dr. Siddiqui for evaluation (Doc. 20-1, p. 2). The medical records indicate through July and August, Ebrahimi was evaluated by Dr. Siddiqui and provided with various permits and a wheelchair until his evaluation by the physical therapist. Crain also spoke with the physical therapist and asked for his evaluation and ensured that the cane was ordered once Ebrahimi was approved (Doc. 150-3, pp. 13-16). There is nothing in the record to suggest that any of her actions once she learned of his need

for a cane rose to the level of deliberate indifference. She took actions to refer him for evaluation and ensured he obtained a cane. Accordingly, Crain is entitled to summary judgment on Count 1.

### D. ADA Claim

Jeffreys is also entitled to summary judgment on Ebrahimi's ADA and RA claim. Assuming that Ebrahimi is disabled, he has received reasonable accommodations. Ebrahimi acknowledged that he received a cane in October 2018. Prior to obtaining his cane, he was provided with numerous permits. He was also provided with a wheelchair in August 2018 while he awaited an evaluation for a cane. There is no evidence in the record to suggest that Ebrahimi was provided with a more restrictive accommodation as he argues in his response. He was provided with access to a wheelchair and was limited to permits only for a short time while he was being evaluated for the need for a cane.

Finally, to the extent Ebrahimi seeks injunctive relief in the form of access to a cane, he currently has a cane and does not point to any evidence suggesting that he is likely to lose access to his cane in the future. Further, there is no evidence that Crain acted with deliberate indifference or that the ADA and/or RA is being violated, which would allow him the award of injunctive relief. Thus, to the extent Wills was added to the case to ensure that any injunctive relief awarded is implemented, he is now dismissed.

### CONCLUSION

For the reasons stated above, the summary judgment motions filed by Dr. Siddiqui and Wexford Health Sources, Inc. (Docs. 146, 147) and Rob Jeffreys, Angela Crain, and Anthony Wills (Docs. 149, 150) are **GRANTED**. Ebrahimi's summary judgment motion (Docs. 151, 152) is **DENIED**. The Clerk of Court is **DIRECTED** to enter judgment and close

the case.

**IT IS SO ORDERED.**

**DATED:  September 23, 2022**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**